Good morning. How are you? Fine, thank you. I'm Terry Collinsworth for the Appellants. I'll try to reserve five minutes for rebuttal to see how that goes. I have two issues I'd like to cover this morning. The first, and I think the most complex and involved, is the political question doctrine. The second is the disposition of Keoghle with respect to this case. I'll start with the political question doctrine, if that's fine. The District Court and Occidental, in this case, have both simply lumped all of the bigger factors together and are trying to argue, and Oxy is now trying to argue, that there's no decision that could be challenged relating to the funding of the 18th Brigade in Columbia, and therefore they're immune from anything that they did. And I think that if you look at the Alperin case and the other political question doctrine cases from this court, that's not the approach. You have to use a surgical approach, look at our claims, and determine whether there's any claim that could be brought that does not question the U.S. government's policy. And I'm going to demonstrate that all of them, all of our claims, fit that description. Well, what actions do you allege that Occidental took through its subsidiary, OxyCol, in support of the 18th Brigade that are different from the United States support of the 18th Brigade? Well, the murders themselves in this case of the three union leaders, it's undisputed that they occurred and that the 18th Brigade members, four of them, murdered the union leaders. These four officers were convicted and they are convicted to 40 years in prison. So in our complaint in paragraphs 130 to 54, we point out that the Brigade murdered the union leaders, and Oxy's supplemental excerpt set, pages 49 to 51, contain paragraphs showing that they were given 40 years each. Now, that is the key to this case, that those murders were illegal, they were not consistent with U.S. policy, and in fact, the U.S. government's policy is to not fund human rights violations with respect to the 18th Brigade. And in the supplemental excerpts at pages 451 to 68 are the actual certifications each year from the U.S. government saying they have to, the U.S. Secretary of State, by direction of the Congress, in order to continue funding the military, has to certify that there were no human rights violations associated with the funding. In the year 2004 that my clients were murdered, the certification, which is at supplemental excerpt page 451, the certification actually says, quote, promoting respect for human rights is central to our policy in Columbia. So there's no, absolutely no challenge to funding or providing helicopters in our complaint. I'm sorry, I'm a little confused. You started out talking about funding, and maybe you didn't get down, entirely down that road, but then Judge Callahan asked you about conduct, and you're not down that road, which is perfectly fine, but I never, I'm not understanding whether you're talking about funding or you're talking about operations. Occidental is accused of doing essentially two things. Funding, providing the money for the brigade, and second of all, of operational control. Right? Absolutely. Okay, so I'll stop. I just want to make sure we're on the same track, that's what I'm asking. Are you making a separate claim as to funding, or are you saying funding doesn't matter because there is operational control? I'm saying that not all funding is immune from questioning here because the U.S. government's funding is conditioned on not having human rights violations. That if Oxy actually funded... Let me ask you, why do you care? I mean, isn't it enough for you if you succeed on operational? Absolutely, Your Honor, but... Okay, so I'm kind of wondering why, and it's always sort of good to start on the most difficult part of the case because, but why do you care? Isn't your claim that funding aside, what Oxy is alleged to have done here is control the operations? So anything that it did operationally doesn't in any way implicate the funding decision, its own funding decision of the United States government. And that's all you really need to win, right? Well, that's sufficient to win, but I think it's just conceptual. You want a big win. Well, I... So you're going to start on the hardest part of your case. Absolutely, I like the challenge. Your Honor, I think absolutely. I can point you to the fact that in our complaint, we're very clear that in paragraph 79-86 that we allege sufficient control. Our various claims are aiding and abetting, conspiracy... Just to help me understand, though, it is your position that if you win on control, or at least if you have an issue of control, you don't need to succeed on funding. You can walk away from funding. There's nothing that gives you more. It depends, Your Honor. I think aiding and abetting might have an element of assistance other than control, or that that's just another dimension of assistance. But I agree that control, if the assistance is directing the activity or controlling the activity, doesn't satisfy... You have a much harder case to make as to funding than you do as to control. Because insofar as accidental is doing the funding, it is doing so cheek to jowl with the United States. And anything we say about funding by accidental, or that in the development of the case would suggest that the funding itself was wrongful, would have implications for the United States. And that makes the political question issue much harder for you. Yes, Your Honor. And I do think that conceptually that's the more direct route. However, I don't think that Oxy can say that any funding decision is off the table because of that conditionality that the U.S. government expressly has. Well, explain to us, because, you know, in answering Judge Callahan's question, you went into operational control. And maybe, let's get away from operational control then. And why don't you explain to us, what is it that we could possibly say in this lawsuit about funding? Not operational control, not anything they did on the ground, but funding that wouldn't implicate funding by the United States, and wouldn't therefore implicate one of the five, or is it six Baker rubrics? The U.S. government's policy on funding is not that we fund no matter what. It's actually against their policy on funding to fund conduct that violates human rights. If the military did it- Well, the fact is they did fund, okay? Yes. And it's possible they funded and were mistaken and made big mistakes, which wouldn't look good. Or maybe the United States government lied, which, of course, it never does. But, you know, in these foreign relations and covert operations areas, sometimes it does happen, or people suspect it happens. I just don't see how we could possibly say something about funding by accidental without embarrassing the United States, without saying either you knowingly funded illegal operations, or you were stupid enough to fund, to give hand money to people who then went ahead and used the money to hire people who were goon squads, basically. On this side, the U.S. government is funding for training and improving operations and trying to stop human rights. These are the guys who then go and kill your clients as heathens, right? Well, not all of them. On the other side- Wouldn't look good, would it? did or did not behave. But a lot less money, though, too, right? Not in 2004. The U.S. money started ramping up at that point. But it's not inconsistent to say if the U.S. had been oxy and knew what this battalion was about to do, they wouldn't have funded them. But I want to move off of funding because I do think that I've made my point. I think if you look at CORI, though, and it's important to say- Do you think you've dug deeply enough? CORI is all about providing the bulldozers and funding. But if in CORI the bulldozers were delivered by a drunken officer who then hit a civilian and killed him, I don't think that CORI would preclude that case, even though the U.S. government bought the bulldozers. And that's what all of those military contractor cases are about. There's something wrongful occurring within the context of a U.S. policy or U.S. funding. They're not immunized in these cases where the contractor did something wrong that violated U.S. policy, including murdering trade union leaders. I want to just briefly talk about Kiobel, and I'll reserve my remaining time. In Kiobel- But so if we were to hypothetically determine that the action is not justiciable under the political question doctrine, do we have to decide anything else? No, that would take care of all of the claims. But I think that at a minimum on the issue of operational control, knowledge, and having a motive, our complaint is sufficient without getting into the funding. And we also allege, and again, Albrin requires that you look at the claims surgically. We have negligent hiring and supervision claims in here that required OXI to do more than continue to fund in the face of the human rights violations that occurred here. To continue to control in the face of the human rights violations that controlled here. Well, how do you rebut the presumption against extraterritoriality? Because this seems like that there are less ties here than in Kiobel. There's much more ties here in Kiobel because we have a U.S. national corporation. This is the only forum that is available. And this is also a case where we think there is U.S. conduct. Kiobel had none of those. It was a pure foreign cube case. Well, there's other things going on in this country regarding this case, right? Haven't some of the victims been compensated? In Colombia, some of the victims have been compensated by an administrative process from the government because the military officers were convicted of murdering them. There is no process going on in Colombia to deal with Occidental. Occidental has not faced any liability there. I note on Kiobel that on March 4, 2014, another case we have against Occidental called Mujica versus Occidental. Is that going to resolve some of the issues that we have in this case? It has. The Kiobel issue was argued. That's the air raid case, isn't it? Yes. Kiobel was argued for about an hour there. And also there is a political question and foreign policy question in that case. I just note that on Kiobel there was a lengthy argument that went into all of these issues. Also that this court's decision in Nestle should control that this whole Kiobel issue occurred after we did the briefing and we were pending on appeal. And that we believe we could allege additional facts that would go to the Kiobel question, particularly on U.S. conduct. And it would be appropriate for the court to, as in Nestle, remand this case to allow us to amend the complaint to have a full record before the Kiobel issue is considered. Why didn't you do that the first time around? Because Kiobel was a fantasy of the defense bar at that point. There was no decision in Kiobel until we had already been dismissed. And at that point in time, Sari v. Rio Tinto was the law of the circuit that it did apply extraterritorially. So we had no need to, we could not have anticipated that it would happen. And also that this particular test would be applied. I'd like to reserve my remaining time, if I could, for rebuttal. Okay. Thank you. Good morning, Your Honors. Matt Klein on behalf of Occidental Patrol. I'd like to jump right to the control question, if I could, that Chief Judge Kosinski and Judge Callahan were asking about. There are four significant reasons why the political question document would bar this control theory from applying in this case. The first is the notion that the Colombian Army and Occidental Patrol, a state oil company, ceded all power and control to a company. It would be deeply offensive to one of our closest allies in South America. This is the second oldest democracy in South America. Well, who cares? This is what Corey talked about. Embarrassing the United States is not the same as embarrassing one of our allies. The second half of Corey, Your Honor, when Judge Wardlaw was applying the fourth, fifth, and sixth Baker test, she says we cannot implicitly or indirectly indict the Israeli defense forces for their conduct under the auspices of this case. And while plaintiffs are saying that they only want to go after the corporate defendant to carry their case to its logical conclusion, we would also have to condemn one of our close allies. We had no closer allies in South America. But the other actors, the actors were foreign nationals, right? All the United States did was funding. No, to get to my second point and your point about cheek to cheek. Well, honestly, that's a factual question. Factual question. The answer to my question is no? The answer is no. If you look at the factual record, including the government accountability report, the U.S. News and World Report study that was put in with plaintiff's complaint. You know, I don't know that we can go past the opinion.  Oh, I'm sorry. You're talking about Corey, Your Honor. I thought you were talking about the facts of this case. No, we were talking about Corey. I said in there, all you had was funding. All you had was funding in Corey. There you had funding. All of the actors were Israelis. Correct. The guys on the bulldozers. You had funding plus the policy decision that we want to continue funding despite the knowledge that plaintiffs allege in that case that that funding was being used by the Israeli defense forces to commit grave human rights abuses. It's the same sort of theory that was applied in this case. And it's the same complaint. If you look at paragraph 172 of their complaint, their argument is the same argument as in Corey, that you knew or should have known if you provided the funding, if you had this control, these grave human rights abuses would occur. And what Corey says is applying the fourth, fifth, and sixth factors. And I'll get to my other points about control in a moment. No, but I thought you were not going to talk about funding. I thought you were going to talk about operational control. I am. You're backing into funding. No, I'll go right through control. The second point is that the United States government, to use your metaphor, Your Honor, was cheek to jowl in terms of control in this case. If you look at the government accountability report that Judge Anderson cited. That's not what they allege in the complaint. But you're allowed to look at the reports that they cite in the complaint. This government accountability report is cited explicitly in their complaint, and both under the rules of judicial notice that Judge Anderson applied. They didn't object below to the court considering this government accountability report. What that report says is the U.S. Embassy in Bogota, U.S. Embassy in Bogota was operating, was acting in day-to-day control, day-to-day control of aviation activities engaged by the 18th Brigade and day-to-day control of ground activities engaged by the 18th Brigade. If you look at the U.S. News and World Report, articles cited in their complaint, again, judicially noticeable and accepted by the court below over no objections. It talks about generals, major generals, captains, sergeants, Green Berets, special A-teams on the ground in Sardinia, the very city where this murder occurred in 2004, cheek to jowl, training these 18th Brigade soldiers. So the notion that there was no control being operated by the U.S. government, it's just, it's fanciful, and it's not supported by the very documents they chose to cite in their complaint as evidence. You say they were attached? They were cited? They were referenced, Your Honor, and we moved for judicial notice of them. They did not object to the judicial noticing of them. The third reason why this control theory just doesn't work is they advert to the 2004 security agreement. That agreement is not with the named defendant in this case. That agreement is with Ecopetrol, the state oil company in Columbia. And that agreement, Mr. Collinsworth says, there's no, you know, conditions about what type of aid is being provided. There's a very express condition about what type of aid is being provided. Only non- Non-lethal. Non-lethal aid, houses, food, they were building hospitals, they were building schools. Moreover, there's So your argument is that excludes the kind of control that they're talking about in this case? It excludes the lethal forces that they say were used to perpetrate the murder. And then in another Because it limits the control factor to the non-lethal aspects of it. And then if you look at page 142- I'm not following at all. If you look at page 142 of the record, there's two points to make. Page 142 of the record is the much more direct point. Ecopetrol and the government and the security contract that they've cited in the complaint, Ecopetrol says we have no control over you government. And the government and the military says we retain all operational control. You cannot tell us what to do. We can terminate this contract at any time. You have no control over us. That's Ecopetrol. So even the state oil company that's entering into this contract with the military, it disclaims any notion of control. In addition to the point I was making earlier to Judge Trott, I think probably- I'm sorry. I'm lost completely. The notion- you've asked can they state a control theory to get around the political question doctrine. I don't think I asked that. I'm reasonably sure I didn't ask that question. I have assumed that they're trying to state a control theory, and we're not here to adjudicate that. The question is whether it is barred by the political question doctrine. You sort of kept getting the funding, but you said there is also- your answer was, but if you look at the documents in the complaint, they also contain allegations that operationally the United States was involved. Correct. So that's the last thing I remember that I understood what you said. After that, I'm lost. Under the fourth, fifth, and sixth Baker factors, the control theory is barred because the United States government exercised far more control, and to suggest that Occidental Petroleum exercised control because of this contract. That's not alleged in the complaint, but you derive that from documents that they reference in the complaint. Correct, Your Honor. Even though they don't allege it. Now, why is that part of the case if they choose not to allege it? Corey says the political question is a subject matter jurisdiction question. And you can go beyond- Even not a subject matter jurisdiction case. I understand that, but only if it's implicated in the case. Only if something that we say or do in the case is likely to redound to the detriment or impugn the United States. Now, they have not alleged anything like that. How would it come into the case? I mean, I know you can sort of pick it out of their- out of staff's sight, but so what? If it's not necessarily implicated in the case so that it would have to be decided, why does that fact matter? It is necessarily implicated because it's an obvious defense we would raise. In Baker v. Carr, it goes through the six- It's a what? An obvious defense that we would raise. In Baker v. Carr, the court goes through the six different tests for finding political question. The next thing the court does, two paragraphs later, it cites this case of Luther against Borden, which is an old Rhode Island case involving a very simple trespass. And to your point, the plaintiff in that case, all it said was, this person entered my home improperly. Daniel Webster, on behalf of the defense, stands up and says, they were able to enter your home properly because they are the proper government of Rhode Island in the Dorr Rebellion that engaged Rhode Island for many years. And the Supreme Court said, hey, that's a political question. Even though this is a simple trespass case, the obvious defense to it, that we were the appropriate Republican government in Rhode Island, not these other imposters. Let me understand what you just said. You said your defense is going to be that your client exercised no control at all over the activity that resulted in these deaths. Our first defense is that these are the acts of three rogue soldiers in the Colombian government, as found by the Colombian courts, as found by the UN Special Rapporteur, again, another source cited in their complaint. Our second defense is, if anyone's liable on one of these respond yet superior vicarious liability theories, it's going to be the U.S. government. To Judge Callahan's point, they provided $100 million. They provided ammunition. They sent down the Green Beret Special Forces teams to train the 18th Brigade, both in human rights training, but also in more lethal actions to go into the city of Serevena, the region of Serevena where the murders took place. The United States government had a barrack in the city of Serevena, according to the very documents cited in their complaints. They were cheated to jail. I am still not understanding. I mean, in the case that you cite, the Supreme Court case, the defense was the guy who went in was the Rhode Island government. But they're not claiming that here. They're claiming that this is a private company that did training that led to these deaths. How do you then come in and say, oh, no, it's the United States? What would be the basis of admitting? What would be the relevance? Your Honor, there's not a single allegation in the complaint that Occidental Petroleum, the name defended in this case, trained anyone. The only reference— Oh, I'm sorry. Operational control. They directed them— There's no operational control. There's zero. There's not a single fact pled on an Occidental employee doing anything. The only thing ever cited, the one thing and only thing ever cited is this 2004 security agreement. If you read the 2004 security agreement, it's not with our client. It's with Equipetrol. It's with the state oil company of Columbia. And it says we have no control over you. So Iqbal tells us we are bound by the well-pled allegations in their complaint. There is no claim pled in the complaint of operational control. There is no fact— I'm sorry. You want it both ways. You want to rely on things in their complaint that they don't rely on, and then you want to say they didn't rely on enough facts. So you're sort of going both ways on me here. No, Your Honor. In order to do the actual political question— I ask you, how do you bring in the United States if they don't allege anything about the United States? How do you bring them into defense? This is exactly what Corey talked about. It said even if you try to plead around the United States— You know, don't talk to me about Corey. Talk to me about how you bring them in. How does this come in in this case? The Iraq memo that we cited in our brief, it talks about how the United States government, the deputy head in Bogota, and the head of the Colombian Armed Forces came to Echo Patrol and said we need nonlethal support. We need housing. We need food. You know, I don't think you're understanding me. You're giving me evidence. I'm asking you how any of that stuff comes in. How does it get brought into the case? You are now back in district court and you're saying we're now going to implicate the United States. How do you do it? Why wouldn't the objection be, look, this is not relevant. The evidence doesn't come in. As in Corey, Your Honor, it's all through judicial notice, and it's all through reading their complaint and the documents cited in their complaint. Their complaint— I still think you're not following me, and I'm going to ask it one more time. If you don't have an answer or don't want to answer, that's fine, but that's going to be the last time, again, you're going to hear the question. And if you don't have an answer, I'll have to go in, out, and, you know, make my decision without your answer. How, as a matter of legal theory, does stuff come in? Not the documents, not, you know, what is your legal theory for bringing any of this in? The legal theory is the political question doctrine. But we will decide, let's assume we decide this against you, and you're now back in district court. How would this embarrass the United States? How do you bring this stuff in? Through the defenses we plead in the case. And what is the defense? Explain to me how you bring in the United States. We were not the cause and fact of this conduct. If anybody was the cause, it was the Colombian army. If anybody was the cause, it was the U.S. government. This is what the military contractor cases talk about. There's a difference between them being able to allege, which they haven't, that this person who works for you committed this tort, this person did not fix the helicopter and the helicopter crashed, versus you made this general decision to, and again, it's not Occidental, the company here, it's the subsidiary again in Colombia. This general decision was made to provide funding. This general decision was made to enter into a contract. Our position would be that type of conduct did not cause any harm. You're not pointing to any acts of any tortfeasors. And if you win on that, then you'll have won, and that's it. How do you bring in the United States? By losing. Either by losing, but the jury instructions in the case would be you don't have to find... Okay, if you lose, how does that bring in the United States? Well, because we would be saying here the jury instructions that we asked for that said we could not possibly be the cause in fact because we did not provide the lethal aid. The only people providing lethal aid were the United States government. The reason why we made the decision to, this would be the sorts of defenses that would be interposed. The reason that OxyCall felt comfortable entering into this contract is the United States government had certified the human rights record of Colombia. The reason why we felt that we didn't have to fire and get rid of this contract, they had to complete a ratification during the case. The reason why we didn't have to back out of the contract is the U.S. government post-2004 ratifies its 2003 Memorandum of Agreement with the Colombians, and every year from 2003 to 2011 continues to fund that government, and every Secretary of State from 2003 to 2012 has certified the Colombian government. How can you say under your California common law claims we breached the standard of care, we were negligent, we ratified when the U.S. government made all these decisions with knowledge of the same exact facts? Now, no one until this case, in 10 years of litigation in Colombia, no one until this case ever implicated Occidental Petroleum in any way, shape, or form with this incident. This incident happened 80 kilometers away from this oil field, and in none of the cases, and there are scores of cases brought to the plaintiffs in Colombia, and not one of them did ever challenge Occidental de Colombia's conduct. Occidental de Colombia is subject to the laws of the state of Colombia, under its agreements with Agri-Petrol, and submits to jurisdiction there, and no claims are ever made. The claim is only made in this case, and the reason why I keep on referring to Iqbal and those sorts of theories is that those are completely independent, adequate, alternative grounds to affirm the judgment below, if there's any qualms, any trouble with the political issue. I know, but was an Iqbal claim in your brief? Extensive, Your Honor, that they sued the wrong party. There's absolutely no allegations that Occidental Petroleum, the name corporation in this case, was a party to this contract, and they say, give us a chance to amend, because we want to say that somebody at Occidental Petroleum Los Angeles might have approved this contract, and give us discovery, we might find out. But what Iqbal says very clearly, and Your Honor is the one who addresses this in your opinions, is we're not going to let people make those types of fanciful allegations and then hope for something juicy in discovery. That's just not permitted anymore post-Iqbal, and that is a completely independent, adequate ground. But as far as this implicates Kiobo, if we get past the political question doctrine, they should be allowed to allege more facts, right? I don't think so, Your Honor. They said that Kiobo and extraterritoriality was a pipe dream at the time that we raised it. The Solicitor General's office had filed a number of briefs saying that extraterritoriality was a bar. We raised exactly that argument. We invited them to amend. We invited them even to stay the case. But Rio Tinto was the law of the circuit, right? Rio Tinto was the law of the circuit, but we said we're filing a cert petition in that case, which ultimately helped lead Kiobo to answer the second question that it answered, which was, can corporations be liable to the extraterritoriality question? We said, this is an issue we've presented in Rio. It's an issue that's going to get resolved soon. The United States government is all over this issue. We think we should either amend or stay. And they said, no, we don't want to do either. We want to press ahead. The same is true with political question. They say we need more discovery. They never asked for such discovery below. And this court's case law is clear of litigation rundown, saying that you can't lose and then say, hold on a second. I want a chance to amend. I want a chance to discuss. It's slightly tantalizing to me that there's no statement of interest from the government in this case. If I understand the Mujica case correctly, there was one there. What explains why there isn't one here and why nobody asked for one? Well, Your Honor, a few reasons. In the Republic of Iraq case, which is 928SF-517 out of the Southern District of New York, the judge there observes that the Obama administration has pursued a policy, which would apply here, of not filing statements of interest early on in litigation. Does that preclude you from asking them for one? We didn't think we needed to ask for one because we thought the Congressional Appropriations Act, the congressional hearings that we cited to you, the government accountability reports, were as abundantly clear about what you're supposed to do. I'm sorry, what's your answer to Judge Trout's question? It did not preclude us at all, Your Honor. Why don't you start by answering the question? So if it doesn't preclude you, isn't it curious? Should we ask for it? That was my next question. Should we ask for what their position is on this? You could. The plaintiffs could have. No one did. I think that this case is – You didn't. We didn't feel we needed to under Cory. Either that or you thought maybe it was risky to. I mean you say you didn't feel you needed to, but that's not inconsistent with not feeling this is not a chance we want to take. Your Honor, in Alperin, this court observed that statement of interest don't get filed all the time. Yeah, I know, but still it seems interesting to me that you're saying, boy, this could destroy the United States, you know, make idiots out of all the decisions that were made. And yet the United States is kind of silent on the whole thing. Maybe you're right, maybe you're wrong. I mean maybe they would say, yeah, we don't have any interest in this case. It's not a problem. It's not going to embarrass them. I mean how do we know what they would say one way or another? We don't, Your Honor. All we know is that the Obama administration has not pursued a policy of filing early statement of interest in cases. We did not pursue one because – What does that mean, not pursued a policy of filing early interest statements? I think what it means is they want to see how the courts adjudicate cases. I think this case is a perfect example of why a State Department statement of interest was not needed. You had a clear case on point, which was Cory. You had very clear policy articulations from Cohen. Now you're asking us to guess why the State Department knew about this and decided not to do anything? I'm not at all. What Alperin said is it's a neutral factor. What Alperin explicitly holds is that this court, in the absence of a statement of interest, should view that as a neutral factor. It can view it as a curious factor. Alperin also says that. I think, Your Honor, in the Henry Philippines cases many years ago talked about the curiosity of a lack of statement of interest. But it's not dispositive. Alperin – because there are so many cases – How did a statement of interest get in in the Majika case? I didn't litigate that case, Your Honor, so I can't tell you. You don't know. But I do know that in Cory there was no statement of interest. There was an amicus brief that ultimately got filed by the Department of Justice in that case. And as recorded in – I think another instructive opinion, if you want to look at this and think more deeply about the issue, is Judge Mukasey's opinion in 340 F sub 2nd at 505 to 506. This is one of the kind of Holocaust-era insurance cases. He said, look, we really don't need to be getting these statements of interest. We can also be looking at very express statements of U.S. policy outside the confines of litigation, and that is things like State Department reports, Department of Defense reports. And we're not going to ask for these statements of interest because, A, who knows how long they're going to take to get. B, they tend to be somewhat equivocal. And C, we applying the Baker v. Barr six-part test can really figure these things out for ourselves. And in our submission, and just to kind of walk through the hierarchy of arguments, we think this case is ripe for summary affirmance under Cory. We do think it fits neatly under all of its teachings. Secondly, we do think a very square Iqbal issue has been presented here. I'm sorry, summary affirmance? You have a motion for summary affirmance? I think that this case falls so neatly under it, Your Honor, that a memorandum of disposition. We understand that this isn't the D.C. Circuit. There's not a summary disposition procedure here. Sure, sure, of course. You can file a motion for summary affirmance. They seldom get filed. They seldom do, Your Honor, but we do think that this is a case that's not making new law. But we're here now. We're past the stage where you can file a motion. We are, Your Honor. So let's just have a rhetorical flourish, somebody. No, what I mean is that we don't think that this is a kind of big step forward. You want us to go out and put it in? Not in the least. Not in the least. What I'm trying to do is just kind of walk through the hierarchy of arguments. We think that the political question argument is pretty squarely presented, and it falls into the four corners of Tory. We think the second argument that takes care of all the claims in the case is the Iqbal argument, and I think this case presents classic Iqbal problems because the wrong defendant is sued. There's only very bare conclusory agency and alter ego allegations. The actual contractual control language that is cited doesn't say anything like that it is adverted to in the complaint. And the third argument is the Keeble argument, and to talk briefly about that, we don't think leave to amend needs to be granted as a Nestle because this issue was teed up, raised, and no amendment was made. If you look at the— Thank you. Thank you, Your Honor. Thank you. Thank you, Your Honors. I want to go back to this control issue that is certainly central to the political question issue. Again, at pages—at paragraph 79 to 86 in the complaint, we have our key control allegations. One of them in paragraph 82, the president of OxyContin, Stephen Newton, says that—sorry, 83. He specifically says, we have 200 men from the Army and 90 from the police. And the point is that they didn't have the whole 18th Brigade. They didn't—I'm not alleging that. It's not in the complaint, this brigade that was funded. They had some of them, and they were under their control. There were only four officers that were convicted of murdering the three union leaders, and the Colombian government went after them because the U.S. government pressured them to do that. The U.S. government has the certification. If Colombia had not gone after them, then their money could have been cut off. They actually investigated the higher-up officers beyond the trigger men and found insufficient evidence to prosecute them. So only the so-called trigger men were prosecuted. Oxy—there's no question in paragraph 144 of the complaint—Oxy's helicopter then took the bodies of the murder trade union leaders away, and then began a process of trying to cover up what happened. That's typical of this particular unit, that they would dress people up in guerrilla uniforms. They called it false positives to try to make it look like they were combatants when they weren't. Now, the key takeaway is we don't have to show that the entire brigade was bad. We could just show that those four officers were bad. And on the scale of issues, let's say—we don't allege this, but it helps to illustrate— that if we could show Oxy paid those four officers, wholly apart from what else is going on in the policy level, they hired them to kill the union leaders. No question that would not be a political question, doctrine, problem, because they were operating outside of the parameters of the policy and they did something illegal. We're only one small step back from that. We're saying they aided and abetted, they conspired with, or that they had these folks as their agents that then did the direct wrongful acts. And I will point out that both Lane and KBR Burn Pit—two very important cases from the Fifth and Fourth Circuit, respectively— both of those cases were in the context of a military operation. And within that operation, there were allegations that the contractors did something wrongful or negligent, and the cases were allowed to proceed. In both of those cases, those circuits said, it's just premature to say that the political question doctrine applies. Maybe there's going to be some overlap, but we've got to get into the case and see. And that's what should be done here. We ought to be able to litigate this. I don't believe the U.S. government is legitimately in this case, but certainly the law is clear that if there's a question, and we're saying there isn't, that we be allowed to proceed. And if there comes a point where they're right that the U.S. government is suddenly in the crosshairs of our case, then the political question doctrine could be looked at again. But it's premature. What about that report that they've referenced that say basically the United States trained, the United States directed, the United States was deeply involved in all these operations? Have you cited any complaints? That report is very ambiguous for everything that they say. It doesn't cancel out our theory. Our theory being that Oxy zeroed in on a small group of the battalion or the brigade, and those were the people answerable to them. We don't say the entire brigade was an agent. We say that the actors involved here were agents and that Oxy had that kind of control. And we have their president saying they have 200 men instead of 5,000 men or whatever the size of this thing is. So we don't have to go there. We don't have to say the entire brigade was bad. We have to show that Oxy participated in an agent in the battalion or agency relationship. But you were here when I had this discussion with your opponent counsel, and he said, well, I would say this wasn't us, it was the United States. If anybody is responsible for this, it's the United States. And that if they are allowed to raise that, entitled to raise that, which they may be, wouldn't that implicate the United States? They don't need to torpedo our case by putting words in our mouth. That's not our allegations. Well, the report was in your complaint, so they can certainly rely on that. But the report does not say that the U.S. government owns the military, and there's no language like that. And that's a factual question to be sorted out. But I don't believe that there's any language in the report that would allow the conclusion, the only conclusion to be that only the U.S. government is responsible, because Oxy was funding outside of that agreement. And that is the key of our case here, that we were looking at what control they had based on their funding. And if you look at our allegations, they say things like, Oxy says things like, we expect security, we expect them to jump when we say it, because we paid them. And that's not the U.S. government saying that at all. I would conclude by saying, again, that if Oxy paid these individuals to murder the three union leaders, there's no question that case could go forward. The teaching of Alperin is to look surgically at these claims. And there's no conceptual difference between our theories of aiding and abetting agency and conspiracy to say that if we can show they did that, then the U.S. government is not implicated in that process. Thank you. Thank you very much. Okay, the case is argued. We'll stand some minutes. The next argument in.
judges: KOZINSKI, TROTT, CALLAHAN